[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 40 
The defendant maintains a railroad through the town of Colonie, Albany county, New York, known as the Troy and Schenectady line. At a place known as Dunsbach Ferry Station the railroad is crossed at right angles by a highway known as the Dunsbach Ferry road running north and south. At this point the railroad runs east and west.
On the 29th day of May, 1921, the plaintiffs' intestate was driving an Essex touring car across the track while proceeding south and was struck by a train going east and killed. This action was brought to recover damages on the ground that the death of James W. Horton was caused by the negligence of the railroad company and resulted in a verdict for the plaintiff. The judgment in her favor, however, entered upon this verdict has been unanimously reversed by the Appellate Division and the complaint dismissed on the ground that the deceased was guilty of contributory negligence as a matter of law.
The order states that the reversal was on the law.
In considering this case, therefore, we are obliged to take the evidence most favorable to the plaintiff and see whether it makes out a question of fact for the jury or whether, considered in the light of the most favorable inferences, it fails to justify a recovery. That is, on all the evidence and the reasonable inferences to be drawn therefrom most favorable to the plaintiff, does it appear as a matter of law that the deceased was guilty of contributory neglect? The burden of proving contributory negligence was on the defendant. (Sec. 265 of the Civil Practice Act.) The facts surrounding the accident are as follows:
James W. Horton was a married man, fifty-two years of age, living in Cohoes. On the 29th day of May, 1921, at about fifteen minutes past ten on a Sunday morning, he was driving on the Dunsbach Ferry road in a southerly direction approaching the track of the Troy and Schenectady line of railroad. This was a single track. *Page 42 
The train was approaching from his right and was completely hidden from view until the traveler was almost upon the track. Alongside of the roadway, hiding the approaching train, was an embankment five and one-half feet high, covered with grass a foot or more high. This bank extended down to within about nine feet of the northerly rail of the track. The top of the bank or mound was about fifteen feet from the track. This is the estimate given by John Flynn, Jr., a civil engineer. Other witnesses said that the view to the right or to the west was obstructed to even a greater extent. A witness, Robert Wilson, said: "You have got to be close to the track before you can see a train."
A witness named William Trimble testified: "Q. How close has the south bound traveler got to be to the defendant's tracks, going south out of the Dunsbach Ferry Grove, before he has any view to the west? A. Well, you get right up on the tracks before you have any view. Q. It is so blind they cannot see, isn't that true? A. Yes, it is a bad crossing there."
Another witness, Joseph Stevenson, presented the situation as follows: "Q. Now your view to the west as you go south along that road from the Grove is obstructed all the way along, is it not? A. Yes, sir. Q. How close do you say you have to be to the defendant's tracks as you go south along that road before you can see a train approaching from the west? A. You have got to be pretty close. Q. Well, what is your best judgment? A. Two or three feet."
These witnesses for the plaintiff are corroborated by the defendant's fireman who was on the train, Francis Barrington. He was asked: "Q. Did you continue to look straight ahead from the time you got back into your cab until this collision occurred? A. Well, I kept glancing sideways, and ahead, both. Q. Well, you could not see anything by glancing sideways, could you? A. Well, not very far, no. Q. You could not see this highway *Page 43 
by glancing sideways? A. Not until you got within twenty feet of it."
If the man on the engine could not see the highway until he got within twenty feet of it, the people on the highway could not see the engine until it got within twenty feet of the crossing.
This being the situation on this Sunday morning in question, James W. Horton drove his car down towards the track at about ten miles an hour until he approached the disc or railroad sign erected three hundred feet from the track pursuant to section53-a of the Railroad Law. He then slowed down to about five or six miles an hour and proceeded cautiously as described by Albert Cushan and Charles W. Carter.
Carter was in a Ford car drawn up on the westerly side of the road about twenty feet north of the railroad track. He was talking to Cushan who stood with a foot on the step of his car.
Horton passed these men. Fifteen or more cars were also stationed in the vicinity alongside the road. There was a church nearby which the occupants of these cars were to attend. Cushan says: "I was standing there and Mr. Horton came up the road, blowing his horn — well, as he was approaching up towards me I got out of the way. My back was turned toward the crossing and facing Mr. Carter's machine, and as Mr. Horton passed me I came back again and I faced the crossing. Well, as I faced the crossing Mr. Horton approached the track with his front wheels, and at that I see the engine, or cow catcher of the engine coming out of the cut, and it struck Mr. Horton's automobile just by the door and his seat there, about there. * * * Q. When you say a `cut' what do you mean, this bank on the west side of the highway? A. This bank on the west side of the highway, yes. Q. How far was the cow catcher of this engine from the Horton automobile when you first saw it stick out from behind that bank? A. Oh, *Page 44 
probably six or seven feet. * * * He was coming slow as I call it, because there is so much traffic on that road that a man has got to be very careful. Q. Have you any idea about what speed he was going at down at Rowe's house (600 feet north)? A. Well, probably he was going ten or twelve miles an hour. Q. From the time you first saw him until you stepped out of the way to let him go by, did the speed of his automobile change any? A. Well, yes, it slackened up. Q. And at about what speed would you say he was going when he passed where you were standing? A. Well, I should judge about six or seven miles. Q. As Mr. Horton came along that road, from the time that you first saw him, in which direction was he looking? A. Well, he was looking more this way (ind.) towards the west there as I would call it, coming along. * * * Well, he was coming right along * * * He was looking kind of sideways going along * * * looking towards the west."
Charles W. Carter gives the same testimony. He says that he was twenty feet from the track when Horton passed him and that when he first saw the engine, as it came out from behind the bank, it was only five or six feet from the crossing.
"Q. Did the speed of his automobile change any from the time you saw him at Rowe's house until he got up where he passed your machine? A. Yes, he slowed up considerably. He couldn't go any faster for he could not get through. Q. Now as he passed your automobile which way was he looking? A. To the west. I spoke to him. Q. About what speed would you say he was going at as he passed your automobile? A. About five or six miles an hour; very slowly. I had time to speak to him."
Taken in conjunction with this testimony we must also consider these additional facts:
There was no regular passenger train on Sundays until five o'clock in the afternoon. There was one freight *Page 45 
train which ran in the morning. The gateman was not in attendance and the gates were left up all Sunday. From three hundred to one thousand people attended Dunsbach Ferry Grove on Sundays at this time of year, using this crossing. The train which struck the deceased was an extra running at twenty-five to thirty miles an hour without signaling by bell or whistle of its approach.
Given these set of circumstances, the contributory negligence of James W. Horton would be a question for the jury unless the rule which has heretofore existed covering these crossing cases has been modified by section 53-a of the Railroad Law. (Cons. Laws, ch. 49) I take it, from reading the briefs and the opinions below, to be conceded that without this statute there would be ample evidence to justify a recovery. The Appellate Division, however, has given to section 53-a a meaning which changes very materially the rules of the common law as they have heretofore existed and places all the risk of an accident in crossing a railroad track upon the driver of any kind of vehicle. It has been said that because of the provisions of this section the plaintiff was guilty of contributory negligence as a matter of law because he did not stop his automobile before crossing at a point where he could have seen the train. This calls for an analysis and interpretation of section 53-a.
This section is part of article III which relates to the construction, operation and management of railroads. Section 53 provides for signboards, flagmen and gates at crossings. Then comes section 53-a adopted in 1919, chapter 438, Laws of 1919, which provides that every municipality or political subdivision shall install and maintain an approach warning sign on each side of each railroad grade crossing at a distance therefrom of not less than three hundred feet. The sign shall consist of a circular metal disc twenty-four inches in diameter with a white field, and a black border line one inch wide and with black perpendicular and horizontal cross lines two and a half *Page 46 
inches wide, the reverse side of each disc colored black. In each of the upper quarterings shall appear in black the letter R, five inches high, three and three-quarter inches wide, lines one inch stroke.
Then comes the provision in question: "It shall be the duty of the driver of any vehicle using such street or highway and crossing to reduce speed to a safe limit upon passing such sign and to proceed cautiously and carefully with the vehicle under complete control."
It is said that this has placed a new and additional duty upon the drivers of vehicles. Let us see. It applies to the driver of any vehicle using the road. This includes wagons, carriages, bicycles, automobiles. It has no special reference to automobiles, for if it had we would find the provision under the Highway Law applicable to motor vehicles. The provision is in the Railroad Law having reference to the operation of trains and the maintenance of railroads.
In the next place the driver in passing the disc three hundred feet from the crossing has to reduce his speed to a safe limit. So far as this applies to the point three hundred feet from the railroad crossing it is new. At this point drivers must reduce their speed to that which is considered to be safe. Without the statute no driver was permitted to cross railroad tracks at an unsafe limit of speed. Whether under this statute or under the common law the safety of his speed must of necessity depend upon the circumstances, the place and the surroundings. The statute does not say what a safe limit is. Who is to determine it? Shall we say as has the Appellate Division that because a collision occurred the speed was necessarily unsafe? In one sense this is true, but surely this cannot be the meaning of the statute. The legislature never intended to place upon the farmers and upon automobiles the entire risk in crossing a railroad track. If this were the law there could never be a recovery for an accident at a crossing. The vehicle could not get *Page 47 
across unless it were in motion and whatever its speed it would be an unsafe limit because it proved to be unsafe. The Railroad Law never intended that the vehicle slowing down to a safe limit should always stop before crossing the track. If this is what the legislature had intended it would have said so. It did say so specifically in section 56 of the Railroad Law which required all locomotives to stop where railroads crossed each other.
The use of the words "reduce speed to a safe limit" indicates that the vehicle is to keep going, but at such a speed as to be reasonably safe under all the surrounding circumstances and conditions. This is nothing more or less than was required at common law and prior to the statute. No man could drive recklessly irrespective of speed in crossing a railroad track. He was bound on approaching it to have his vehicle under control and to reduce it to a speed which would be reasonably safe under all the conditions. As I say, the only thing new in this statute is that the speed shall be reduced three hundred feet from the track.
Now what are the other requirements? The driver is "to proceed cautiously and carefully with the vehicle under complete control."
This is the same duty that rested upon him at all times and prior to the statute. In order to be free from contributory negligence a driver was obliged to proceed cautiously and carefully in view of all the circumstances and he was always compelled to have his vehicle under complete control. The following authorities justify this statement.
A driver must employ his senses of hearing and seeing to avoid danger. If not he is negligent as a matter of law. (Dolan v.Delaware Hudson Canal Co., 71 N.Y. 285; Kellogg v. N.Y.C. Hudson River R.R. Co., 79 N.Y. 72.)
That he must exercise care and caution see Greany v. LongIsland Railroad Co. (101 N.Y. 419). *Page 48 
In Carr v. Pennsylvania R.R. Co. (225 N.Y. 44) it was noted that the driver in crossing the railroad track had his horse under control and his mind on the danger. And in Avery v.N.Y., O. W. Ry. Co. (205 N.Y. 502, 507) we find the rule stated in 1912, some years before the passage of this section53-a of the Railroad Law, to be the following:
"The rider of a bicycle should have it under full control and, especially, when the circumstances are such as, within human probability, to make his control a reasonable assurance against danger, as well to himself, as to others. A person driving a horse, or driving a bicycle, would, in neither case, be required to get down at a railroad track, in order to look before crossing; for that would be requiring extraordinary care, rarely exercised by the most prudent. But he must approach with ordinary care and with horse, or wheel, under such complete control, as to permit of stopping within a reasonable time, if by so doing injury could be averted."
What has the Railroad Law added to this? Does the word "carefully" mean more than ordinary care? Does the word "cautiously" suggest anything more than ordinary care under circumstances which suggest danger? Do the words "with the vehicle under complete control" indicate more than the words I have quoted above written by GRAY, J., "under such complete control as to permit of stopping within a reasonable time?"
Unless we permit the imagination to furnish a purpose which has not been expressed, we can find nothing in this provision of section 53-a of the Railroad Law which places any greater duty or burden upon the driver of a vehicle crossing a railroad track than existed at common law. There is this one exception as above stated that at the three-hundred-foot mark he must slow down his vehicle. This is peremptory. To what speed is not stated.
Applying this law, therefore, to James Horton, we find that as he passed the railroad disc coming from *Page 49 
Rowe's farm he slowed down from ten miles an hour to five or six miles an hour; that he looked in both directions as he approached the track; that if he had listened he would not have heard any sound, as no whistle or bell was rung, and that his automobile even going at the low rate of five miles an hour, which is the speed of a man walking, would almost be on the track before he could see whether a train were coming.
Remember the fireman had said that the road could not be seen until the engine was twenty feet from the crossing; that other witnesses had stated that the train could not be seen on account of the bank alongside of the highway until within fifteen feet of the rail, at which time the front of the automobile would have been eight feet from the track and still going. Other witnesses had indicated that the train could not be seen until even nearer than fifteen feet. Assuming, however, as does the defendant, that Horton could have seen up the track one hundred and eighty feet when nineteen feet from the rail, he was not called upon as a matter of law to look at his peril exactly nineteen feet from the northerly rail. (Kellogg v. N.Y.C. H.R.R.R. Co., supra.) It would be for the jury to say whether he was proceeding cautiously and carefully with his vehicle under complete control even if he did not happen to look until he was nearer the track than nineteen feet. He was obliged to look both ways. It was care and caution which he was called upon to exercise and these are relative terms. The act itself only prescribes one specific thing to be done, that is to slow down.
Also as bearing upon the question of Horton's care and caution we may take into consideration the absence of any warning or notice of the approach of the train to a crossing which was well known to have been a dangerous crossing and hidden from view. (Wall v. International Ry. Co., 233 N.Y. 309, 312; Carr v.Pennsylvania *Page 50 R.R. Co., supra; Barthelmas v. L.S. M.S. Ry. Co., 225 Penn. St. 597, 601.)
I cannot find in the acts of Horton, as I have given them above, any evidence that he violated section 53-a of the Railroad Law, and I find nothing in the entire case to justify the courts in saying so as a matter of law. Whether he did was a question for the jury.
The rule in Pennsylvania requires a driver to stop before crossing a railroad track. Yet it does not require him to get off his wagon and go forward to get a view when he cannot see from the place he has stopped. (Barthelmas v. L.S. M.S. Ry. Co.,supra.) The court said: "The law requires vigilance and care with every step taken, and these rise in degree with the risk. Therefore, if the proper place at which one stops admits of but a restricted view of the track, and the conditions are such as to deaden the sound or signal of an approaching train, it is the traveler's duty in entering on the crossing to be all the more cautious and observant; but the law defines no particular act in this connection which at his peril he must do or refrain from doing. If it be shown that he stopped at a place as good as any other for observation, and looked and listened without seeing or hearing warning, whether he was negligent in entering upon the crossing would depend entirely upon the circumstances under which he made the attempt. In this case the circumstances proper to be considered would be the open gates * * * and the silence of the bell. * * * Certainly the conditions invited the plaintiff to attempt the crossing."
The defendant requested the court to make this charge which was refused and to which an exception was taken:
"1. If, as he was approaching the crossing, Mr. Horton, at a distance of 19 feet north of the north rail, had a view of 180 feet, measured from the center of the crossing, in the direction of the oncoming train it was a duty imposed upon him by section53-a of the Railroad Law, *Page 51 
not merely to have his automobile under such degree of control and to proceed therein at such rate of speed that he could stop in time to avert a collision, but actually to bring his automobile to a stop, if necessary to avert a collision.
"2. Such was his duty, also, if, as he approached the crossing, Mr. Horton, at a distance 12 feet north of the north rail, had a view of 445 feet, measured from the center of the crossing, in the same direction."
What I have stated above about the nineteen-foot point is applicable here. This charge assumes that if the deceased could have seen up the track one hundred and eighty feet when nineteen feet away from the track, then he was bound to do so and could not recover if an accident happened. In other words, the court was asked to charge that if Horton could see up the track when nineteen feet from it, then he was bound to stop his car and prevent the collision.
As I have above stated, the Railroad Law places no such burden upon him. It does not charge a driver with the entire responsibility for crossing accidents. The statute does require care, caution, control, a safe limit of speed in passing the disc, all of which things are dependent upon circumstances and surroundings, making, in this case, a question for the jury. The collision itself is no evidence that the deceased had not reduced the speed of his automobile to a safe limit or was not proceeding cautiously and carefully with his vehicle under complete control.
For these reasons the judgment of the Appellate Division, reversing the judgment of the Trial Term as a matter of law and dismissing the complaint, must be reversed and the judgment of the Trial Term reinstated, with costs in the Appellate Division and this court.