ROLAND BROWN, Respondent, *v.* THE DELAWARE AND HUDSON COMPANY, Appellant.

Third Department, February 18, 1931.

*Joseph Rosch* [*J. L. Fitzgerald* and *P. C. Dugan* of counsel], for the appellant.

*Armand A. Mancuso* [*John H. Broderick* and *Morris Simon* of counsel], for the respondent.

WHITMYER, J.   Plaintiff is seeking damages for personal injuries alleged to have been sustained by the negligence of defendant.

Whether or not he was guilty of contributory negligence as matter of law is the question here.

He was injured on June 13, 1927, at about eight A. M., in a collision between a truck, which he was operating in an easterly direction over defendant's Cemetery Station crossing, located a few miles northerly from Albany, N. Y., and an engine, running light, in a northerly direction on the easterly or north-bound track of defendant's two-track railroad.

The tracks are straight and on practically level ground for some distance in each direction, northerly and southerly, from the crossing. He had driven over it a short time before that morning, going westerly, with a load of gravel for St. Agnes Cemetery, on the westerly side of the railroad. He said that he had never been over it before. On his return, he stopped for a drink of water at a pump, located about forty feet westerly from the cemetery gate, which is about ninety-six feet westerly from the westerly rail of the south-bound track.

He said that, after leaving the pump, he started in low gear, shifted into second when he was in or near the gateway, and had the truck in high gear when he was going on the track; he was watching north for a south-bound train; when he got to the track he saw that the front wheels of his truck were on the track before he saw the north-bound engine coming from the other direction. He said, further, that he looked to the south when he was nearly onto the crossing, about half way between the gate and the crossing, but that he could not see more than one hundred feet and did not see any signs of a train; then, he watched to his left for a train coming from behind the station; the wheels of his truck were nearly on the crossing before he could see from his cab and see

a train coming from the north, because the station was so close to the westerly rail of the south-bound track; nothing was coming from the north; his truck, then, was on the south-bound track; he kept proceeding slowly and, on looking the other way, the engine was "on top" of him, not more than forty or fifty feet away, coming at more than thirty miles an hour.

On cross-examination he said that he put the truck in high gear when he was about twenty feet back from the first rail, not with full power, but just barely moving, and could stop in two feet; he looked north and did not look south until he could see clearly to the north; when he looked south he was on the first track; he had looked south before that, when he was about thirty feet from the crossing and before he put his truck in high gear, but could not see very far, he said, not a quarter of a mile, he believed, on account of the trees. How far they were from the track he could not say. He put the brakes on when the engine was "right on top" of him.

The cemetery station is about seventy-five feet north of the road leading into the cemetery. Its easterly wall, at the nearest point, is thirteen feet west of the westerly rail of the south-bound track. Northerly of that point, that wall is sixteen and three-tenths feet from that rail.

A fence extends along the easterly side of the cemetery, about forty and three-tenths feet from the westerly rail. Easterly of the fence and about thirty-one feet from the rail, there was a row of maple trees. It does not appear how many there were or how far apart, but the nearest one was about fifty-five feet from the southerly line of the road into the cemetery and about eighty-five feet from the center line of the road. They varied in size. The cemetery gate keeper said that the branches started two or three feet from the ground and defendant's civil engineer said that they had a spread of about fifty feet.

In the light most favorable to plaintiff, that is the evidence, substantially.

He said that he could not see for more than one hundred feet to the south, when he looked at the point about half way between the gate and the crossing, estimated by him as about thirty feet from the crossing. Then, he put his truck in high gear, but proceeded at a rate of only six miles an hour, barely moving, and could stop within two feet. At thirteen feet from the westerly rail of the south-bound track, he had a clear view to the north. The distance between the rails of that track, on the outside, was about five feet and the distance to the westerly rail of the north-bound track was five feet more, so that he had about twenty-three feet to go,

after that view, before reaching the north-bound track. He did not look south, until his truck was on the south-bound track, when he saw the engine about forty feet away, coming at about thirty miles an hour. He had a clear view to the south, after his first clear view to the north. Moreover, at the speed he was going, he could stop his truck in two feet.

It is clear that he kept his view to the north too long and did not look to the south until it was too late, or that he was negligent in not stopping in time. (*Miller* v. *New York Central R. R. Co.*, 226 App. Div. 205, 208; affd., 252 N. Y. 546.)

We think that the judgment should be reversed and that the complaint should be dismissed, with costs.

All concur; DAVIS, J., in the result with a memorandum.

DAVIS, J. (concurring). When, in 1927, the United States Supreme Court decided the case of *Baltimore & Ohio R. R. Co.* v. *Goodman* (275 U. S. 66), it was generally recognized that the decision presented a new doctrine on the subject of contributory negligence in a railroad crossing case — at least in those States where the " stop, look and listen " rule was not already operative. The court laid down definite rules of human conduct.

In general that case wrought little change in the doctrine in such cases outside of Federal courts. In this State the decision was not without influence. In 1929 in determining that a man injured at a railroad crossing by a train which had given no signals of its approach, was guilty of contributory negligence as a matter of law, the majority opinion in this court cited the *Goodman* case. (*Miller* v. *New York Central R. R. Co.*, 226 App. Div. 205.) The judgment dismissing the complaint was unanimously affirmed without opinion (252 N. Y. 546). I think the rules of conduct laid down in that case are but little less definite than those in the *Goodman* case.

In another crossing case (*Schrader* v. *N. Y., C. & St. L. R. R. Co.*, 254 N. Y. 148) a majority of the Court of Appeals has cited with approval the *Miller Case* (*supra*), and again determined as a matter of law that the plaintiff did not exercise a proper degree of care in approaching the crossing. The *per curiam* says that the court has never adopted or been influenced by the " stop, look and listen " rule laid down in the *Goodman* case; but that opinion is not commonly shared. (See 15 Cornell Law Quart. 136.) It seems to me that there has been a shift in philosophy and in rule of liability in the cases just mentioned and in *Sarnowski* v, *New York Central R. R. Co.* (227 App. Div. 643). There seems to be a definite doctrine that the question whether the traveler looked from a proper view point, is in general one of law.

Earlier cases had indicated that the question of contributory negligence in crossing cases was ordinarily a question of fact. I quote from but a few. It was said in a case often cited (*Massoth* v. *D. & H. Canal Co.*, 64 N. Y. 524, 529): " The question of contributory negligence in cases of this character is ordinarily one of fact for the jury. It depends usually upon a variety of circumstances, and upon inferences from the facts proved, calling for the exercise of practical knowledge and experience, and is peculiarly within the province of a jury of twelve men." In *Greany* v. *Long Island R. R. Co.* (101 N. Y. 419, 425) it is said, quoting from an earlier case: " ' The plaintiff is not bound to see; he is bound to make all reasonable effort to see that a careful, prudent man would make in like circumstances. He is not to provide against any certain result. He is to make an effort for a result that will give safety; such effort as caution, care and prudence will dictate.' I know of no exception to the doctrine that where there is any evidence, direct or inferential, of care or caution on the part of the person injured, the question whether it was in compliance with that rule, is for the jury." And in *Smith* v. *N. Y. C. & H. R. R. R. Co.* (177 N. Y. 224, 229) we find: " It cannot be said that intelligent and reasonable men, applying the rule of ordinary care to the facts of this case, could not fairly differ in their answers to this question and, therefore, it is one for the arbitration of a jury and not for the decision of a court."

In a more recent case (*Carr* v. *Pennsylvania R. R. Co.*, 225 N. Y. 44, 47), POUND, J., writing for an unanimous court, said: " On all the evidence, it may be entirely reasonable to conclude that he went to the crossing heedlessly, without thinking of it or paying any attention to it, but we cannot accept his version and say, as matter of law, that his negligence was palpable." And in *Chamberlain* v. *Lehigh Valley R. R. Co.* (238 N. Y. 233, 237) it is said: " But the degree of care is determined to some extent by the elements of danger which exist. When the view is obstructed; when the traveler approaches the crossing with his car under control and his mind on the danger; when at the time of the accident he is looking from a proper view point in one direction with his attention directed to the possible approach of a train, it cannot be said as matter of law that he should within ten seconds shift his attention to another direction, although had he done so he would have seen the approaching train in time to avoid the accident." In *Horton* v. *New York Central R. R. Co.* (237 N. Y. 38, 49) the rule is stated: " It would be for the jury to say whether he was proceeding cautiously and carefully with his vehicle under complete control even if he did not happen to look until

he was nearer the track than nineteen feet. He was obliged to look both ways. It was care and caution which he was called upon to exercise and these are relative terms."

Likewise, it has been held that the absence of signals from the approaching train was an element that the jury might consider as an excuse for inattention in passing upon the question of contributory negligence. (*Beisiegel* v. *New York Central R. R. Co.* 34 N. Y. 622, 624; *Ernst* v. *Hudson River R. R. Co.*, 35 id. 9, 27; *Weber* v. *N. Y. C. & H. R. R. R. Co.*, 58 id. 451, 456; *Carr* v. *Pennsylvania R. R. Co.*, *supra*, p. 47; *Horton* v. *New York Central R. R. Co.*, *supra*, p. 49.)

In earlier cases it was held as a matter of law that a plaintiff was guilty of contributory negligence only where there were unusual and exceptional circumstances indicating a complete absence of care. (*Steves* v. *Oswego & S. R. R. Co.*, 18 N. Y. 422; *Powell* v. *N. Y. C. & H. R. R. R. Co.*, 109 id. 613; *Heaney* v. *Long Island R. R. Co.*, 112 id. 122; *Dolfini* v. *Erie R. R. Co.*, 178 id. 1.) I am speaking of those cases where the traveler was approaching the track with a horse-drawn or power-driven vehicle, and not those relating to bicyclists or pedestrians.

It is difficult, under the present rule, to understand under what circumstances a plaintiff may not be charged with contributory negligence as a matter of law if he is so unfortunate as to be injured at a railway crossing. If he is seventy-five feet or more from the crossing and has a clear view, he must see the train. (*Dolfini* v. *Erie R. R. Co.*, *supra*.) If he has looked twice at distances of four hundred and of seventy-five feet from the track, and then with view obstructed fails to look again in both directions at about twenty-six feet from the track, he is subject to the rule; and he may not rely upon listening for signals from the train, because " hearing is an indifferent guard to safety as one approaches a grade crossing." (*Miller* v. *New York Central R. R. Co.*, *supra*, p. 208.) The failure to give signals is no longer to be considered in determining the fact of contributory negligence. The giving of signals is, therefore, but an idle ceremony not affecting liability. There is but one safe rule for the traveler — and that is to stop. Then no accident will occur, regardless of the negligence of the railroad company.

In the *Horton Case* (*supra*) the obstructed view terminated at distances estimated by witnesses from *two* to *nineteen* feet from the track. It was held that contributory negligence of the plaintiff was a question of fact. So it is a question of fact if one drives upon the track using his senses, and with his mind on the danger, if the unobstructed view begins at nineteen feet; but it is con-

tributory negligence as a matter of law if his unobstructed view occurs at a distance of *twenty-six* feet. (*Miller Case, supra.*) It is somewhat difficult to understand the principle reduced to such narrow terms. We are told that " No two crossing accidents are identical," and " Our rule of conduct is not standardized " (*Schrader Case, supra,* p. 151), but this does not clear the confusion caused when we compare the earlier with these latest decisions. However, we must adjust our views to the new rule and learn to determine from the conflicting testimony and the divergent inferences when one has approached a crossing " without taking any precautions for his safety." (*Schrader Case, supra,* p. 152.)

In the present case I think the *Miller* case is controlling. There is a dispute on the question of giving signals here, where in the *Miller* case there was none. At least thirty feet from the track the plaintiff would have had an unobstructed view. He was moving then at a speed of six miles an hour. Failing to see and stop, he was guilty of contributory negligence as a matter of law. I do not accept the principle, but I yield to authority and concur for reversal.

Judgment and order reversed on the law, with costs, and complaint dismissed, with costs.