SARAH J. STOKES, as Administratrix, etc., of JOHN STOKES, Deceased, Respondent, v. THE DELAWARE AND HUDSON RAILROAD CORPORATION, Appellant.

Third Department, March 17, 1932.

*Joseph Rosch* [*J. L. Fitzgerald* of counsel], for the appellant.

*Pratt & Fowler* [*Sharon Mauhs* and *Willard R. Pratt* of counsel], for the respondent.

HILL, J. The administratrix has recovered a judgment for the death of her husband, which a jury found resulted from the negligence of the defendant in failing to give reasonable and timely signals before one of its trains crossed Grand street in the village of Cobleskill, N. Y. The train was east bound, the deceased in an automobile came along Grand street from the south. He was in Cobleskill on business connected with the Schoharie County Agricultural Fair. He had attended this fair in years previous to 1930 when he was killed. He arrived on Monday, September 22, 1930, and was killed the next evening between nine and ten o'clock. He ate his supper at a restaurant on the north side of the railroad, and a little after six o'clock passed over this crossing on the way to the fair grounds. He was killed on the return journey. A gate-tender operated the gates which were maintained at the crossing until six o'clock in the evening, and during the fair a watchman directed traffic at this point until seven in the evening.

Four of defendant's tracks cross Grand street. From the north, the first is the west-bound track, the second is the east-bound track, where deceased was killed. Eight and eight-tenths feet south from its southerly rail is the north rail of a siding of standard gauge. Four feet south from the first siding is a second siding, also standard gauge. West of the crossing the main tracks are straight for three hundred and thirty-four feet, then curve slightly to the north. The grade is downward from the west for nearly ten miles. The train which struck deceased had run by gravity for that distance, the grade being such that it was necessary to apply the brakes at intervals. There is a descending grade in Grand street south from the crossing, six per cent in the first sixty-seven feet, and three and thirty-eight one-hundredths per cent in the next one hundred feet. As deceased returned from the fair grounds, he brought his automobile almost to a stop seventy-five to one hundred feet south of the crossing. From that point his view of the tracks to the west was obstructed until he had passed two factory buildings and a lumber shed, the latter forty-three feet south of the east-bound track and seventy feet west of the center of Grand street. After passing the shed, his view was

unobstructed by buildings until he reached the flagman's shanty which stood forty feet east and ten feet north of the shed. After passing the shanty, seven feet in width, it was twenty-six feet to the nearest rail of the east-bound track, and the view to the west was unobstructed. A witness who was walking northerly on Grand street says that deceased passed him about two hundred feet south of the crossing, and describes the approach to the crossing and the collision: "As the Ford approached the track, within seventy-five feet, it came to almost a dead stop, then it went on to go up an incline, it seemed to increase very little, and at that time I seen a train — an engine approaching, about in the rear of a lumber shed. * * * The train came in view in back of this lumber shed. At that time it didn't seem no more than perhaps a second when there was a terrible collision."

Giving weight to the finding of the jury that adequate signals were not given, the only warning of the approach of the train was the headlight and the inherent rumble and roar, the latter somewhat lessened from the ordinary, as the train was coasting. The evidence indicates that for some distance the rays of a headlight on a locomotive coming from the west were intercepted by a creamery building which stood to the south of the tracks and adjacent to the curve. The headlight on the locomotive which struck deceased was focused so that the direct glare of the rays struck the track about 1,000 feet ahead, thus after the train rounded the curve and was on the straightaway approaching the crossing, there was only a shaft of light some feet above the tracks, and not the illumination incident to the direct focusing of the rays. The visibility of this shaft of light was not as marked and striking in the village where there were numerous automobile headlights as it would have been in the darkness of the open country. When deceased was within about 100 feet of the tracks, an automobile with lighted headlights came over the crossing from the north and met him, and other automobiles with lighted headlights were standing on the north side of the crossing.

After the accident the emergency brake of the automobile was found to be tightly set. Skid marks had been made as by locked wheels beginning about two feet north of the first rail of the side track and continuing to about the center line of the second side track, a distance according to my computation of less than ten feet. Their course there changed to the east, indicating that the front of the car had been struck by the locomotive and turned.

The evidence of the witnesses justifies an inference that deceased had his mind upon the crossing and its danger as he approached it, and that he brought his car nearly to a stop to ascertain if it was

safe to proceed. (*Schrader* v. *N. Y., C. & St. L. R. R. Co.*, 254 N. Y. 148.) The grade in the street made necessary the increased speed after the stop. I cannot say that it was unreasonable under the circumstances and conditions. (*Horton* v. *N. Y. C. R. R. Co.*, 237 N. Y. 38.) During the brief interval after he passed the shed and before approaching the shanty, he may have been looking to the east, or at the automobiles apparently approaching from the north. The skid marks indicate that he saw the train soon after passing the shanty, but was then unable to stop in time to avoid the collision. The inability to stop within the distance which remained after realizing his peril might have been occasioned by the increased power necessarily applied in order to negotiate the six per cent grade in the street. The open gates, the absence of the watchman who had been present when he went to the fair grounds earlier in the evening, are circumstances which may be considered as bearing upon the vigilance he was bound to exercise. I am unable to say as matter of law that this deceased was heedless of the ordinary precautions which he should have taken, or that in view of the grade in the street his speed was shown to be careless and negligent. He had taken precautions, and with the burden upon the defendant, I believe contributory negligence was an issue of fact and not of law.

The judgment and order should be affirmed, with costs.

All concur, except VAN KIRK, P. J., and HINMAN, J., who dissent on the ground that the finding that there was a failure on the part of the defendant to give adequate signals is so against the weight of the evidence that the judgment should be reversed, and vote for reversal and for dismissal of the complaint on the ground that the deceased was guilty of contributory negligence as matter of law.

Judgment and order affirmed, with costs.