New York Central Railroad Company, Plaintiff, *v.* Glen Campbell et al., Defendants.

Supreme Court, Trial Term, Onondaga County, December 1, 1952.

*J. Boyd Mullan* and *Richard G. Crawford* for defendants.

*Donald Mawhinney* and *Gerald Henley* for plaintiff.

SEARL, J. A jury has awarded plaintiff a verdict of $99,233.57. Defendants move for a new trial on the court's minutes and grounds specified in section 549 of the Civil Practice Act, except insufficiency.

The railroad owns and operates a line running from Rochester to Syracuse, known as the Auburn line. It runs easterly and westerly, as a single track road from the village of Waterloo to the village of Seneca Falls. Midway between these two villages it is crossed at right angles by a county highway known as the Huff Creek Road. On the night of August 28, 1951, at about 10:30 P. M. daylight saving time, an east-bound train, consisting of a diesel engine, baggage car, combination mail and baggage, coach and Pullman, collided with a trailer being hauled by a tractor proceeding south. The tractor was owned by the individual defendants and driven by one of the owners, Glen Campbell. The trailer was loaded with cases of Kentucky Tavern whisky. The defendant, Chicago Express, Inc., counter-claims for $33,045.88. This was the amount of the claim made by the owners of the whisky, Glenmore Distillers Company Inc., against Chicago Express, Inc., which the latter has paid. The complaint alleges, and it was admitted, that the driver of the truck and trailer, Glen Campbell, was at the time in the employ of and subject to the direction of defendant, Chicago Express, Inc. Defendant, Glen Campbell, owner of the trailer, counter-claimed for $4,500, being the value of the trailer.

In a trial lasting six days, plaintiff submitted proof that at the time of the collision the train was derailed, the diesel engine

thrown from the tracks onto its side, together with the baggage car, and the tracks torn up for a considerable distance. Plaintiff swore some eight witnesses to effect that the horn on the diesel was blown as well as the bell rung almost continuously from the time the train left the Waterloo station, nearly two miles distant, up to the time of the actual collision. Some of these witnesses were employees. Defendants swore some six witnesses to effect that they heard only one blast of the horn immediately preceding the crash.

The position of the engineer on the right side of the engine would make it impossible for him to see the lights of the tractor trailer as it approached the crossing. The fireman, on the left side of the engine, said the headlight beam showed the tracks for a distance of 800–1,000 feet ahead. The train was traveling, as shown by the recorder, forty-nine miles per hour. He testified he did not see the tractor until it was within four feet of the north rail. On pretrial examination he had stated that he did not see it until it was on the crossing. At that time the engine was within forty or fifty feet of the crossing. He yelled "whoa" to the engineer, who threw on the emergency brake and the collision occurred.

Ample evidence was given to support the amount of the verdict. The cost of the diesel engine, purchased two or three months before the date of the collision, was shown to have been $164,455. An estimate for repairs to the diesel was shown to have been $100,000. Considering all elements, this court cannot say the verdict as rendered was in any way excessive.

At the end of the evidence a motion was made to dismiss the two counterclaims. Decision on these motions was reserved until after the jury reported. The verdicts, as rendered, now make the decision on these motions academic. Had verdicts been rendered for defendants, granting damages on the counterclaims, the court would have been inclined to grant the motions for dismissal. The driver of the tractor and trailer testified that he had picked up 1,106 cases of whisky at Cincinnati, consigned to Springfield, Massachusetts, the day before the wreck. He stated that he drove east until in the village of Clyde he took a wrong turn by which he found himself on a black top road; that he stopped a passing motorist who directed him to continue ahead on the road that would eventually bring him onto Routes 5 and 20, an improved highway. It was then after dark. He continued driving south until he reached a height of land 1,800 feet north of the crossing. From this point he could see the

headlights on cars passing east and west on Routes 5 and 20, a half a mile south of the crossing. The evidence disclosed the presence of a disc sign located on the driver's right side, 306 feet before reaching the rails. In daylight from the brow of the hill, 1,800 feet north of the crossing, the driver could have seen in the direction from which the train was approaching, with the exception of a few scattered trees, to the west of the crossing for a distance of 900 feet. At 125 feet north of the crossing he could have seen 1,000 feet, and at a distance of twenty-five feet north of the north rail, 1,620 feet. He said he saw what he thought was a light of a car passing on Routes 5 and 20. His lights, turned down, showed objects 150–200 feet ahead. He claimed he had encountered patches of fog. Those in the neighborhood claimed it was a clear night and no one else testified to observing any fog.

This driver claimed he was proceeding at thirty or thirty-five miles per hour, and when about halfway from the top of the knoll, which would be 900 feet north of the crossing, cut down his speed to twenty-five miles per hour. He continued at this speed until his equipment came to a stop by reason of the air brakes being severed, and he found the trailer cut in two as though by a knife. His tractor was then beyond the crossing, the entire length of the equipment being forty-five feet.

Section 53-a of the Railroad Law is very specific. It provides: '' 53-a. *Warning Signs.* Every municipality or political subdivision or in case of state highways the department of public works, which is charged with the duty of maintaining a highway at places where such highway crosses a railroad at grade, shall install and maintain an approach warning sign in each such highway on each side of each railroad grade crossing at a distance therefrom of not less than three hundred feet. The approach warning sign shall consist of a circular metal disc thirty inches in diameter with a yellow field, and a black border line five-eighths inch wide set in three-eighths of an inch from the edge of each such disc and diagonal cross buck in lines two and a half inches wide, the reversed side of each disc colored yellow. In each of the side quadrants shall appear in black the letter R, six inches high and four and three-quarters inches wide, in lines of one inch stroke. Self reflecting buttons may be used for better night visibility. The top of said sign shall be not more than five and not less than four feet above the grade of such highway, the exact height to be fixed so that the circular metal disc shall be most readily illuminated by the headlights

of passing automobiles. The exact location of any such sign shall be determined by the commission."

Then follows this requirement: "It shall be the duty of the driver of any vehicle using such street or highway and crossing to reduce speed to a safe limit upon passing such sign and to proceed cautiously and carefully with the vehicle under complete control."

The evidence disclosed this sign, two and one-half feet in diameter, to have been placed two feet, three inches from the edge of the pavement and five feet above the ground. Conceding the sign to have been of such a size and placed in accordance with law, it cannot properly be said that the driver could pass it at the rate of twenty-five miles per hour, then proceed across the tracks without observing them, without being found guilty of contributory negligence as a matter of law. True, he was unfamiliar with the location. Assuming that he is correct in his contention that he heard nothing approaching and mistook the light for a passing vehicle a half mile from him, can he still escape this direct mandate of the statute to slow down and have his vehicle under complete control? The law required the sign to be so placed as to attract the attention of the motorist. It is provided that "Self reflecting buttons may be used for better night visibility." Though not mandatory, yet we find this sign was so provided.

It would seem that the old adage, that one is deemed to see what seeing would reveal, must be here accepted. (*Schrader* v. *New York, Chicago & St. L. R. R. Co.*, 254 N. Y. 148; *Horton* v. *New York Central R. R. Co.*, 237 N. Y. 38.)

The defendants' motions for a new trial are therefore denied in each instance.